UNITED STATES of America,
Plaintiff–Appellee,

v.

Juan CASTILLO, aka: Luis Hong
Rojas, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Antonio De La RENTA,
Defendant–Appellant.

Nos. 87–5042, 87–5045.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1987.

Decided April 22, 1988.

Victor Sherman, Santa Monica, California, Brian O'Neill, Santa Monica, Cal., for defendants-appellants.

Thomas K. Buck, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before ALARCON and NELSON, Circuit Judges, and ROSENBLATT,* District Judge.

ALARCON, Circuit Judge:

In these consolidated appeals, Antonio De La Renta (De La Renta) and Juan Castillo, also known as Luis Hong Rojas (Castillo) (collectively appellants) seek reversal of their convictions for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982) and for being aliens in possession of a firearm in violation of Appendix II, 18 U.S.C. § 1202(a)(5) (Supp.1985).[1] They also challenge the judgment requiring forfeiture of $134,998 pursuant to 21 U.S.C. § 853(a) (Supp.1985).

Appellants contend that the district court erred in denying their motion to suppress evidence seized during the search of De La Renta's apartment. In addition, Castillo argues that the district court committed reversible errors during his trial and that the evidence was insufficient to support the jury's verdict. In addressing these contentions we must answer the following questions:

(1) Whether the affidavits presented in support of the request for the arrest warrant were sufficient to support the magistrate's finding of probable cause.

(2) Whether the district court's finding that the affidavits were not prepared with a deliberate or reckless disregard for the truth is clearly erroneous.

(3) Whether the officers had sufficient facts to justify a protective sweep of De La Renta's apartment after he was arrested.

(4) Whether the district court's finding that De La Renta voluntarily consented to a search of his apartment was clearly erroneous.

(5) Whether, during closing argument, the Government improperly commented on Castillo's failure to produce evidence.

(6) Whether the district court erred when it gave the jury supplemental instructions on the meaning of "intent to distribute."

(7) Whether there was sufficient evidence of dominion and control to support the jury's finding that Castillo had possession of the cocaine, guns and currency found in De La Renta's apartment.

## I.

## FACTS

On June 29, 1986, a warrant for De La Renta's arrest was executed at De La Renta's apartment. The arrest team was comprised of federal and local law enforcement officers. When De La Renta opened the door, two officers of the Los Angeles Police Department (LAPD), Detectives Ray Martin and Michael Farrant, approached him with weapons drawn, identified themselves and stated the purpose of their visit. De La Renta was handcuffed and taken into the living room of the apartment.

Once De La Renta was in custody, the arrest team made a protective sweep of the apartment to assure themselves that no one else was present. During this sweep, the officers located two bedrooms. On entering the first bedroom, Detective Farrant saw some wrapped packages lying in plain view, between a nightstand and the wall. They were partially covered by a T-shirt and wrapped in the same manner that cocaine is packaged. The lettering on the outside of the packages was similar to that previously observed by Farrant on packages containing cocaine.

The second bedroom was locked. Farrant knocked on the door to the second bedroom and announced his presence. He could hear voices and noises inside. After announcing his presence two more times,

---

* Honorable Paul G. Rosenblatt, United States District Judge, District of Arizona, sitting by designation.

**1.** On May 19, 1985, Congress repealed this statute, effective 180 days from that date. Firearms Owners' Protection Act, Pub.L. 99–308, §§ 104(b), 110(a), 100 Stat. 449, 459, 460–61 (1986). The indictment was handed down prior to the effective date of the repeal.

he and a second officer forced entry into the bedroom. Castillo and Teresa Contreras were lying in the bed. Castillo was on the south side of the bed. The officers also observed a small amount of powder, which they believed to be cocaine, on top of the dresser in the second bedroom.

Farrant then took De La Renta into the first bedroom and obtained his verbal consent to search the apartment. De La Renta refused to sign a consent form. Farrant discussed the effect of De La Renta's refusal to sign a consent form with the other members of the arrest team. The officers decided that a search of the apartment was proper based on De La Renta's verbal consent. The search was terminated when one of the officers discovered a large sealed U-haul box in the second bedroom containing what appeared to be numerous packages of cocaine.

Farrant contacted Assistant United States Attorney Enrique Romero and described what had occurred at De La Renta's apartment to that point. Romero advised Farrant that the search could continue without a search warrant based on the oral consent. The officers resumed the search of the apartment. In the first bedroom, they found approximately 9,035 grams of cocaine, $130,598 in United States currency and two fully loaded handguns. In the second bedroom, the officers located a fully loaded Model 20 .25 caliber Beretta handgun and approximately $4,000 in one hundred dollar bills under the mattress on the south side of the bed where Castillo was first observed. On the floor, next to the south side of the bed was a compact containing 1.2 grams of 88% pure cocaine. On top of the dresser, in plain view, was .5 grams of 35% pure cocaine. A search of the dresser drawers revealed three clear plastic bags containing cocaine with a total weight of 935 grams of approximately 88% purity. On a shelf in the dresser, behind a door, the officers discovered a cannister containing 119.9 grams of 77% pure cocaine, a triple beam scale, and weights of a type commonly used to weigh narcotics. A duffle bag containing rolls of various colored masking tape commonly used to package cocaine was next to the dresser. The

U-haul box observed earlier on the floor of the second bedroom contained 48.7 kilograms of 88% pure cocaine. In a closet in the second bedroom, the officers found a clear plastic bag with 5.2 grams of 56% pure cocaine, and a Lipton tea bag with .8 grams of 83% pure cocaine, hidden in a leisure suit pocket. On the closet floor, the officers also found 609 grams of manitol, a common cutting agent used to dilute cocaine, a pink duffle bag with containers of manitol and Vitamin B blends, and more weights for a triple beam scale.

In the kitchen the officers found a plastic bag containing 29.9 grams of 36% pure cocaine on the counter top next to the stove.

After completing the search of the apartment, the officers allowed Castillo to go back to the second bedroom to get a shirt and pair of shoes. Detective Martin testified that when Castillo entered the second bedroom he showed irritation at the condition of the room. Castillo selected a shirt and pair of shoes from the clothing removed from the closet and dumped on the bed by the officers during the search.

Before leaving the apartment, DEA Agent Michael Wood removed two sets of keys from the top of a table in the entry way to the apartment. Wood asked Castillo and De La Renta to identify their keys. The set identified by Castillo included a key which operated the perimeter locks to that apartment building.

On July 10, 1986, a Federal Grand Jury returned a four-count indictment against Castillo and De La Renta. In count one of the indictment, Castillo and De La Renta were charged with possession with intent to distribute approximately 66 kilograms of cocaine. Each appellant was also charged with being an alien in possession of a firearm. Count four alleged that $134,998 found in De La Renta's apartment was subject to forfeiture. De La Renta entered a guilty plea to counts one, two and four pursuant to Fed.R.Crim.P. 11(a)(2), conditioned on his right to appeal the issues raised before the district court during pretrial proceedings. Following a jury trial,

Castillo was convicted of counts one and three. The currency was forfeited pursuant to count four.

## II.

### MOTION TO SUPPRESS

On October 6, 1986, De La Renta and Castillo filed a joint motion to suppress all of the evidence discovered during the search of the apartment. They argued that the evidence seized was inadmissible because the officers did not act pursuant to a search warrant and the consent to search was involuntary.

The district court held an evidentiary hearing on the question of the validity of the consent on October 20, 1986. On that date, appellants advised the court that they would also challenge the arrest warrant. Pursuant to stipulation, appellants filed a second motion to suppress the evidence based on the alleged inadequacy of the arrest warrant and the lack of veracity of the allegations in the supporting affidavits.

After holding further hearings on the motion to suppress on November 24, 1986 and November 26, 1986, the district court ruled that the affidavit supporting the arrest warrant did not set forth sufficient facts to show probable cause to issue a warrant for De La Renta's arrest. The district court denied the motion to suppress, however, because it concluded that the arrest was valid under the good faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The district court also found that there were no deliberate or reckless falsehoods in the affidavits.

A further evidentiary hearing was held on the consent issue on December 4, 1986.

Thereafter, the district court held that the protective sweep was proper and that De La Renta voluntarily consented to the search.

### A. Validity of The Arrest Warrant

The district court found that the affidavits filed in support of the arrest warrant did not show probable cause because they were "technically deficient by reason of being overly conclusionary." Appellants argue that *Leon* is inapplicable to a defective arrest warrant. They also assert that all the evidence seized following De La Renta's arrest was tainted by illegal conduct and inadmissible. The Government claims that the district court erred in finding that the affidavits were deficient.[2]

#### 1. *Standard of Review*

■ We have not previously expressed our view regarding the standard that must be applied in reviewing a district court's determination that the affidavits presented to a magistrate in support of an *arrest* warrant do not set forth sufficient facts to establish probable cause. The Supreme Court, however, has instructed that in reviewing a magistrate's determination that probable cause exists to issue a *search* warrant, we must decide whether under the totality of the circumstances, "the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). The *Gates* standard of review applies to each court that is required to assess the validity of a search warrant. *Id.* Thus, under *Gates* we must review the

---

**2.** The Government did not file a cross-appeal challenging the district court's holding that there was a lack of probable cause to support the arrest warrant. Nevertheless, the Government's contentions can be considered in this appeal under the rule that an appellee may rely on any argument asserted below in support of the judgment. *Hankerson v. North Carolina*, 432 U.S. 233, 240 n. 6, 97 S.Ct. 2339, 2344 n. 6, 53 L.Ed.2d 306 (1977). *See also United States v. Choate*, 576 F.2d 165, 170 (9th Cir.) (unneces-

sary to file a cross-appeal to support a judgment in appellee's favor on a claim that was advanced below), *cert. denied*, 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978). *Cf. United States v. Moody*, 485 F.2d 531, 534 (3d Cir.1973) (when Government's appeal challenges a district court order suppressing evidence, the defendant-appellee "can raise issues with regard to findings and rulings relevant to that order under the umbrella of the government's appeal").

magistrate's determination of probable cause to issue a search warrant independently of the conclusion reached by the district court. Because the substantial basis test also applies to arrest warrants, *see St. John v. Justmann,* 771 F.2d 445, 448 (10th Cir.1985) (the Tenth Circuit applied the substantial basis test to the review of a magistrate's decision to issue an arrest warrant), we see no sound reason why the requirement that we conduct an independent review, to determine whether there was a substantial basis for the magistrate's conclusion that probable cause existed to justify the issuance of a search warrant, should not apply to the question whether there was probable cause to issue an arrest warrant. Accordingly, we will review the magistrate's conclusion that probable cause existed to issue an arrest warrant independently without deferring to the district court's contrary conclusion.

In applying the substantial basis test, we must give deference to the magistrate's finding of probable cause. We do not engage in *de novo* review. *United States v. McQuisten,* 795 F.2d 858, 861 (9th Cir. 1986). "We may not reverse a magistrate's finding of probable cause unless it is clearly erroneous." *Id.; accord United States v. Stanert,* 762 F.2d 775, 779, *amended and reh'g denied,* 769 F.2d 1410 (9th Cir.1985). Our review is limited to the information contained within the four corners of the underlying affidavit. *See Stanert,* 762 F.2d at 778 (court looks only to the information contained within the four corners of an affidavit when reviewing the validity of a search warrant).

## 2. *Sufficiency of the Affidavits*

■ Applying the standard of review we have adopted in this case to these facts, we find that the district court erred in ruling that the affidavits did not establish probable cause to issue an arrest warrant. Our review of the affidavits presented to the magistrate has convinced us that the magistrate had a substantial basis to support his conclusion that probable cause existed to issue an arrest warrant.

The magistrate based his finding of probable cause on two affidavits prepared by Special Agent Gregory D. Lee of the United States Drug Enforcement Agency (DEA). Lee has had over ten years experience as a narcotics investigator.

The first affidavit was prepared to support the issuance of arrest warrants for eight individuals. This affidavit described an ongoing undercover investigation involving an alleged conspiracy to import cocaine into the United States. Lee alleged that on February 20, 1986 he met with Jose Luis Leon and John Robert Malpezzi, who were suspected drug dealers, and an undercover confidential informant, to set up a cocaine transaction. Lee was told that at the next meeting Leon would be accompanied by a "Columbian National." Lee was told to display the buy money to a "Columbian National who would then deliver the cocaine." On February 25, 1986, Lee and DEA Agent David R. Wilson met with Leon. When Lee arrived at the meeting, he was introduced to "Tony." Tony immediately departed from the meeting. Tony was followed by surveillance agents who eventually identified the Columbian as Antonio De La Renta, "a previously known cocaine dealer in the Los Angeles area." Lee stated that De La Renta and others spent the next several hours after the February 25 meeting attempting to obtain 50 kilos of cocaine to sell to him.

On June 20, 1986, Lee reviewed the first affidavit with the magistrate for approximately one and one-half hours. The magistrate requested that Lee prepare a supplemental affidavit regarding De La Renta's involvement in the scheme. In the second affidavit, Lee stated that during the February 20 meeting he was told that the Columbian National would be at the next meeting to "evaluate me and the situation, and would be the person who would determine if the transaction would take place." Malpezzi told Lee that De La Renta had stated that his sources of supply could not deliver all 50 kilograms of cocaine at once. Lee also alleged that De La Renta had been identified as a "previously well documented cocaine distributor in the Los Angeles area."

The information contained in these affidavits establishes a substantial basis for concluding that probable cause existed to believe that De La Renta was engaged in the illegal sale and distribution of cocaine. An experienced drug enforcement officer informed the magistrate that De La Renta was present at a meeting regarding a large scale cocaine transaction, that he was a known cocaine dealer, and that another member of the conspiracy, unaware that Lee was a DEA agent, had told Lee that De La Renta could not acquire all of the necessary cocaine at one time. While it is true that the affidavits contain some conclusions of the officers, and the alleged facts are insufficient to establish guilt beyond a reasonable doubt or even a prima facie case, the information was sufficient to establish the probability that De La Renta was guilty of the cocaine trafficking. *See Gates*, 462 U.S. at 235, 103 S.Ct. at 2330 (affidavits are sufficient if they show a probability of criminal activity, a prima facie case need not be established).

### 3. *Hearsay Statements in Arrest Warrant Affidavits*

■ Appellants argue that hearsay statements cannot be considered in determining whether probable cause exists to justify an arrest. The law is to the contrary. A magistrate may consider hearsay statements in an affidavit in determining whether there is probable cause to believe that a person is guilty of a crime. *See Gates*, 462 U.S. at 238, 103 S.Ct. at 2332 (a magistrate may consider all of the circumstances set forth in an affidavit including hearsay statements); *United States v. Guerrero*, 756 F.2d 1342, 1348–49 (9th Cir.) (a magistrate can consider hearsay statements in an application for a search warrant if there is a substantial basis for crediting the hearsay), *cert. denied*, 469 U.S. 934, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984).

The affidavits provided a substantial basis for crediting the hearsay statement that De La Renta could not acquire all of the necessary cocaine at one time. The statement was made by an accomplice, as part of the negotiations preparatory to the sale of narcotics. Malpezzi was not aware that

Lee was a DEA agent and had no apparent reason to give him false information about De La Renta. Thus, the magistrate did not err in considering the hearsay statements in the affidavits. *See People v. Fleming*, 29 Cal.3d 698, 708, 175 Cal.Rptr. 604, 611, 631 P.2d 38, 45 (1981) (hearsay statements of an accomplice to an undercover law enforcement officer included in an affidavit to show probable cause are presumed reliable).

### 4. *Veracity of the Affidavits*

■ Appellants also argue that Lee prepared the affidavits with a deliberate or reckless disregard for the truth. Specifically, appellants challenge the statements that De La Renta was a previously known and well-documented cocaine dealer in the Los Angeles area.

The Supreme Court has held that an otherwise valid search warrant can be rendered invalid if the defendant shows that an affiant deliberately, or with reckless disregard for the truth, included false statements in his application for a warrant. *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). Pursuant to *Franks*, a hearing is required to determine whether false statements were deliberately or recklessly included in the affidavit. *Id.*

In the matter before this court, the district court held a *Franks* hearing to determine whether Lee had deliberately or recklessly included false statements in the affidavit. The court found that there was no "demonstration of deliberate falsehood or reckless disregard for the truth."

"The district court's conclusion about whether the defendant has demonstrated recklessness or deliberate falsity after the *Franks* hearing ... is a finding of fact reviewed under the clearly erroneous standard." *United States v. Ritter*, 752 F.2d 435, 439 (9th Cir.1985). The district court's findings were not clearly erroneous.

During the *Franks* hearing, Special Agent Lee testified that he had at least two sources for his information regarding De La Renta's involvement in cocaine traffick-

ing: a DEA agent in Riverside and a former DEA informant who was present during the February 25, 1986 meeting with the suspected dealers. The district court found that Lee was a credible witness after observing his demeanor during direct and cross-examination. There is nothing in this record that demonstrates that the district court's finding that Lee was a credible witness is clearly erroneous. *See United States v. Hodges*, 770 F.2d 1475, 1478 (9th Cir.1985) (questions of credibility are generally immune from appellate review).

The arrest warrant was not rendered invalid because of any false or misleading statements in the affidavits. The magistrate's conclusion that there was probable cause to support the issuance of the arrest warrant was supported by substantial evidence. Because the arrest warrant was valid, we do not reach the question whether the good faith exception to the exclusionary rule applies to a defective *arrest* warrant.

**B. Validity of the Protective Sweep**

■ Appellants argue that the actions of the officers following De La Renta's arrest violated his rights under the fourth amendment and tainted the evidence seized pursuant to the officers' search of the apartment. They contend that the protective sweep of the apartment following De La Renta's arrest was unjustified. Appellants claim that the officers conducted the sweep as a matter of routine and could "point to no specific facts tending to show that they faced a threat of violence."

■ We review de novo a district court's ultimate conclusion on the validity of a warrantless protective sweep. *United States v. Alfonso*, 759 F.2d 728, 741 (9th Cir.1985). The underlying historical facts are reviewed under the clearly erroneous standard. *Id.*

In *United States v. Gardner*, 627 F.2d 906 (9th Cir.1980), we discussed the validity of protective sweeps following a lawful arrest. In *Gardner* we said "[w]hen officers have arrested a person inside his residence, the exigent circumstances exception permits a protective search of part or all of

the residence when the officers reasonably believe that there might be other persons on the premises who could pose some danger to them." *Id.* at 909–10 (footnote omitted). "[T]he Government must be able to 'point to specific and articulable facts which, taken together with rational inferences from those facts, [would] reasonably warrant [the warrantless] intrusion.'" *Id.* at 910 (quoting *United States v. Dugger*, 603 F.2d 97, 99 (9th Cir.1979)). We have also held that "'[c]ourts must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger.'" *United States v. Astorga–Torres*, 682 F.2d 1331, 1335 (9th Cir.1982) (quoting *United States v. Coates*, 495 F.2d 160, 165 (D.C.Cir.1974)), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed. 2d 608 (1982) and 459 U.S. 1108, 103 S.Ct. 734, 74 L.Ed.2d 957 (1983).

De La Renta was arrested in the open doorway of his apartment. The officers testified that at the time of the arrest they did not know whether anyone else was present in the apartment. They believed from reading Lee's affidavits, however, that De La Renta was involved in a large scale cocaine trafficking conspiracy and that bodyguards had been hired to kill suspected informants, police officers, and anyone who tried to arrest the participants. The affidavit contains the following allegation:

> Malpezzi later told the [confidential informant] that he had hired Garcia to be present during the 50 kilo cocaine transaction for the purpose of providing security for the money and the drugs. Malpezzi also told the [confidential informant] that Garcia was there to murder me in the event I was law enforcement organization and attempted to arrest Malpezzi.

In addition, the arresting officers testified that they had had personal experience with cocaine dealers and knew of their tendency to carry weapons and resort to violence. Finally, they had seen Castillo entering De La Renta's apartment on a previous occa-

sion and knew that there was a possibility that he might be present in the apartment.

In support of their argument that there were not sufficient facts to justify a protective sweep, appellants cite cases which are readily distinguishable. In *United States v. Spetz,* 721 F.2d 1457 (9th Cir.1983) the defendants were involved in the sale of marijuana and not cocaine. Furthermore, unlike the facts in this matter, in *Spetz* the arrests occurred in the driveway of the house. *Id.* at 1462. In *United States v. Flickinger,* 573 F.2d 1349, 1355 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978), *overruled* on standard of review, *United States v. McConney,* 728 F.2d 1195, 1205 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), we held that a concern for safety based on a suspect's alleged participation in *non-violent* criminal activity, such as marijuana *smuggling,* is insufficient to justify a protective search. De La Renta was involved in a conspiracy to sell large quantities of cocaine, an extremely valuable substance. The officers were also aware that the members of this conspiracy were protected against discovery or apprehension by armed bodyguards.

Appellants reliance on *United States v. Whitten,* 706 F.2d 1000 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984) is equally misplaced. In *Whitten,* the defendant was arrested in the doorway of his hotel room for the production and distribution of methamphetamines. *Id.* at 1015. We found that there was no evidence of exigent circumstances to support a warrantless search of the hotel room. *Id.* at 1016. There was no evidence that the officers suspected that anyone else might be in the room. There was also no evidence of flight risk. *Id.*

In the matter *sub judice,* there were sufficient articulable facts known to the officers to justify a protective sweep of the premises.

## C. Validity of the Search of the Apartment

■ After the protective sweep was completed, Detective Farrant asked De La Renta for permission to search the apartment. Farrant testified that he spoke to De La Renta in English and his answers were responsive. Farrant told De La Renta that if he did not consent to a search, Farrant would "go to a judge and try to obtain a search warrant." Farrant also informed De La Renta that he did not know whether the judge would give him a search warrant. De La Renta consented to a search but refused to sign a consent form. De La Renta testified that he did not orally consent to a search. He testified further that he refused to sign a written consent form and asked for an attorney.

The district court found that De La Renta voluntarily consented to the search of the apartment. Appellants claim that the record shows that De La Renta's consent was not free and voluntary.

"Whether consent to search was voluntarily made is a question of fact reviewed under the 'clearly erroneous' standard." *United States v. Licata,* 761 F.2d 537, 544 (9th Cir.1985). Voluntariness is "based on the totality of circumstances surrounding the giving of consent." *Alfonso,* 759 F.2d at 740. On appeal the evidence must be viewed in the light most favorable to the fact-finder's decision. *Id.*

We have previously indicated that several factors must be considered in determining whether consent is voluntary. None of them are dispositive. *See Ritter,* 752 F.2d at 439 (absence of Miranda warnings is not dispositive of the question whether consent was voluntary); *United States v. Tolias,* 548 F.2d 277, 278 (9th Cir.1977) (arrest is a factor in determining voluntariness but valid consent can be given while defendant is in custody). These factors include: (1) whether defendant was in custody, *Alfonso,* 759 F.2d at 741; (2) whether the arresting officers have their guns drawn, *United States v. Al–Azzawy,* 784 F.2d 890, 895 (9th Cir.1985), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *Alfonso,* 759 F.2d at 741; (3) whether Miranda warnings have been given, *Al–Azzawy,* 784 F.2d at 895; *Alfonso,* 759 F.2d at 741; (4) whether the defendant was told he has a right not to consent, *Al–Azzawy,* 784 F.2d

at 895; and (5) whether defendant was told a search warrant could be obtained, *United States v. Salvador*, 740 F.2d 752, 757 (9th Cir.1984), *cert. denied*, 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985). The fact that some of these factors are not established does not automatically mean that consent was not voluntary. *See, e.g., Ritter, Tolias.*

De La Renta was in custody at the time he consented. Farrant and De La Renta were the only persons present in the room where the conversation took place. Farrant's gun was holstered. De La Renta was told he had a right not to consent, and if he chose not to, the officers would attempt to get a search warrant. *See Salvador*, 740 F.2d at 757 (a statement to the defendant that he need not consent is evidence of voluntariness). Farrant also informed De La Renta that he did not know whether a judge would issue a search warrant.

Appellants argue that De La Renta's refusal to sign a written consent form vitiated any oral consent. In *United States v. Boukater*, 409 F.2d 537, 539 (5th Cir.1969), the Fifth Circuit held that refusal to sign a consent form, while a factor to be considered, did not preclude a finding of voluntariness.

An analogous situation arises when a person orally waives his right to remain silent or to have counsel present but refuses to sign a waiver form. In *North Carolina v. Butler*, 441 U.S. 369, 371, 99 S.Ct. 1755, 1756, 60 L.Ed.2d 286 (1979), the defendant refused to sign a waiver form. He told the officers, "I will talk to you but I am not signing any form." The Supreme Court held that refusal to sign a waiver form does not conclusively demonstrate that there was no waiver. *Id.* at 375–76, 99 S.Ct. at 1758–59. The Supreme Court instructed in *Butler* that courts must look at all of the circumstances to determine whether there was a waiver. *Id.* at 374–75, 99 S.Ct. at 1757–58.

The same analysis is applicable to a consent to search. The test is whether there was a voluntary consent. Voluntariness is "determined from all the surrounding cir-

cumstances." *Al–Azzawy*, 784 F.2d at 895. Execution of a consent form is one factor that indicates that consent was voluntary.

The facts presented by the Government demonstrate that De La Renta orally consented. The court did not believe De La Renta's testimony that he did not consent. The district court's determination that De La Renta voluntarily consented was not clearly erroneous.

## III.

## ALLEGED ERRORS DURING CASTILLO'S TRIAL

Castillo seeks reversal of his conviction based on alleged errors committed during the guilt phase of the trial. He contends that (1) the Government improperly commented during closing argument on his failure to produce evidence; (2) the court incorrectly charged the jury; and (3) the Government failed to establish beyond a reasonable doubt that he had dominion and control over any contraband.

### A. Alleged Prosecutorial Misconduct During Closing Argument

■ During closing argument, the Government commented on two factual matters not contested by contrary defense testimony. The Government argued that Castillo had not presented any evidence that he did not live in De La Renta's apartment. The prosecutor told the jury:

For all of those reasons, we're saying, yes, he was residing—he was residing there.

And we consider that testimony. And we ask, "Well, if that's true—if"—excuse me. If that were true, what would be the testimony the defense would present? If he wasn't residing there, wouldn't the defense call the apartment manager of the apartment where Mr. Castillo really was residing?

The Government also argued that there had been no evidence that Castillo held any job other than distributing cocaine. The Government counsel argued as follows:

I submit to you that the evidence supports the Government's position that Mr. De La Renta and Mr. Castillo's job was running cocaine.

And I ask you to weigh that against any testimony to the contrary, that this person who is an alien, illegally in the United States, had some other job than the government—which the Government submits.

Castillo contends that these statements constituted an impermissible reference to his failure to testify.

It is well established that the privilege against self-incrimination prohibits a prosecutor from commenting on a defendant's failure to testify. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). However, a "prosecutor may properly comment upon a defendant's failure to present witnesses so long as it is not phrased to call attention to defendant's own failure to testify." *United States v. Fleishman,* 684 F.2d 1329, 1343 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *accord Territory of Guam v. Ojeda,* 758 F.2d 403, 406 (9th Cir.1985); *United States v. Passaro,* 624 F.2d 938, 944 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 842 (1981). The test is whether the comment is "manifestly intended to call attention to the defendant's failure to testify, and is ... of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *United States v. Bagley,* 772 F.2d 482, 494 (9th Cir.1985), *cert. denied,* 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986). In addition " '[a] comment on the failure of the *defense* as opposed to the *defendant* to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege.' " *United States v. Wasserteil,* 641 F.2d 704, 709–10 (9th Cir.1981) (quoting *United States v. Dearden,* 546 F.2d 622, 625 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977)).

The Government commented on Castillo's failure to produce evidence and witnesses, not his failure to testify. The Government made specific reference to the type of witness that could have been presented, such as Castillo's apartment manager. At no time was there any express reference to Castillo's failure to testify. Instead, the Government asked the jury to consider, in weighing the evidence, that the *defense* did not rebut certain evidence presented by the prosecution.

While we have concluded that the authorities cited above require us to hold that the Government's argument did not violate the constitution, we do so under compulsion of the law of this circuit and with strong misgivings. We want to make clear that this panel of three judges does not condone or approve of the Government's argument in this case. As a member of the federal government, every Assistant United States Attorney has a constitutionally imposed duty to protect every individual's privilege against self-incrimination. Any comment on the absence of defense evidence, beyond pointing out that the Government's proof is uncontradicted, risks speculation by a juror that the defendant must be guilty or else he would have testified. No prosecutor should take pride in obtaining a conviction by artfully or unintentionally inducing a jury to find a defendant guilty on improper and unconstitutional grounds. We affirm in this case because there is no evidence that any juror was mislead; thus, no constitutional error has been demonstrated. We recognize, however, as should all Government lawyers, that such evidence is almost impossible to produce. Repeated resort to the type of argument employed here may compel some court some day to conclude that the risk that this tactic will cause jurors to focus on the defendant's failure to testify is intolerable.

**B. Propriety of the Jury Instructions**

Castillo contends that the district court made several errors in its response to jury questions. During its deliberation, the jury requested information regarding the testimony of one of the witnesses. Castillo argues that the district court erred in failing to respond to that request, and in re-

fusing to require the court reporter to read the testimony to the jury. The jury also informed the court that it was having problems understanding the words "intent to distribute." Castillo claims that the district court gave a misleading instruction in response to this request. He also argues that the court erred in failing to give his requested Supplemental Jury Instruction No. 16.

### 1. *Request for testimony of a witness*

 On December 22, 1986, the jury requested "a copy of Detective Martin's testimony regarding the size of the clothes in the closet of bedroom # 2. Specifically, did he say if the clothes were of the size that Castillo wore and if they were all that size." There is nothing in the record that indicates whether the court responded to this request. Detective Martin's testimony was not read to the jury.

We review a district court's decision not to require that testimony be read to the jury for abuse of discretion. *United States v. Nolan,* 700 F.2d 479, 486 (9th Cir.), *cert. denied,* 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983); *United States v. King,* 552 F.2d 833, 850 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). "A trial court is given great latitude in deciding whether to reread testimony requested by the jury. In general, rereading is disfavored because of the emphasis it places on specific testimony and the delay it causes in the trial." *Nolan,* 700 F.2d at 486.

The district court's failure to respond to the jury's request or to order the reporter to read the officer's testimony was not an abuse of discretion. Reading of the witness' testimony would have placed undue emphasis on evidence previously presented to the jury.

### 2. *Validity of the supplemental instructions given to the jury*

 At the end of the first day of deliberations, the district court received a note from the jury stating that it had decided count three but was having problems with count one. The jury was returned to the courtroom. The court was informed that the jury was having difficulty understanding the meaning of the words "intent to distribute." The court advised the jury that it was going to give them "some illumination in the morning." The jury was then told that

> in only the rarest occasions would you ever have direct evidence of an intention to distribute. You have to be dealing with circumstantial evidence, as my instructions, quantity, street value, the impossibility of it ever being used for personal consumption; that sort of thing.

The next day, over Castillo's objection to any further instructions, the district court admonished the jury as follows concerning proof of intent:

> Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind.
>
> But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and done or omitted by the defendant and all other facts and circumstances in evidence which indicates his state of mind.

The jury was then given the following instruction concerning proof of possession:

> Now if there is possession of contraband—as I have instructed you, as defined in the instructions I gave you—logically, it has to be—there are only three possibilities with regard to the intent behind that possession:
>
> One is that the contraband is held for personal use. Two, it is held for transfer of some kind; sale or even giving away, but transfer of some kind.
>
> And the third possibility is that it may be held for—partly for personal use and partly for transfer.
>
> In the case of either two or three, it is, of course, held for distribution.
>
> Now, I want to refer specifically to the page of the instructions which you have that is numbered 37, which talks about particular factors which you can take into account and make any judgment as to the issue of intent to distribute.

And when I focus on 37, I do not mean that you should ignore the other instructions and just consider that one alone. Because it might not be a bad idea for you to review all the instructions that have to do with Count One.

Castillo contends it was clear error for the trial court to tell the jury that direct evidence of intent to distribute is available "in only the rarest occasions." He argues that the statement is false and misleading. He claims that "[i]n effect, the court was telling the jury that it did not have to consider the lack of direct evidence of appellant's intent in possessing cocaine." Castillo also argues that the jury was "misled by the court's instruction ... that appellant could be found guilty if he held the contraband for transfer of some kind or if partly held for personal use and partly for transfer." Castillo asserts that this instruction could mislead the jury into finding "that the small amount of cocaine found on top of the dresser or in the locket was possessed by appellant with the intent to share it with Teresa Contreras."

Jury instructions must be reviewed as a whole. *United States v. Marabelles,* 724 F.2d 1374, 1382 (9th Cir.1984). "Challenged error in the language of the trial judge's jury instruction will justify reversal only if abuse of discretion is shown." *United States v. Patel,* 762 F.2d 784, 790 (9th Cir.1985). The standard of review is the same when reviewing supplemental jury instructions given in answer to a jury's question. *United States v. Hayes,* 794 F.2d 1348, 1352 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

Castillo relies on *United States v. Stephens,* 569 F.2d 1372 (5th Cir.1978) to support his argument that the instruction was improper. In *Stephens,* the district court instructed the jury that knowledge, a necessary element to an offense, could be found by looking at what a reasonable person would know or should have known. *Id.* at 1374. The Fifth Circuit held that this was a clear misstatement of the law. *Id.* Here, the district court's admonition regarding direct proof of intent was not a

misstatement of the law. An undisclosed intent is ordinarily not subject to proof by direct evidence. The district court did not err in its statement of the applicable law in response to the jury's questions.

### 3. *Propriety of the failure to give Castillo's proposed supplemental instruction*

Castillo contends that the court's failure to give his proposed Supplemental Jury Instruction No. 16 was an abuse of discretion. The proposed instruction reads as follows:

> The defendant in this case has been charged with possession with intent to distribute cocaine. He has not been charged with simple possession of cocaine. Therefore, if you do not find that the defendant had the requisite specific intent to distribute, but that he merely possessed the cocaine for personal use or any other reason, you should find the defendant not guilty of count one of the indictment.

"The trial judge is given substantial latitude in tailoring the instructions, and a challenge pertaining to the trial judge's language or formulation of the charge is reviewed only for abuse of discretion." *United States v. Burgess,* 791 F.2d 676, 680 (9th Cir.1986).

The district court properly instructed the jury concerning the elements of the charged crimes. A party may not demand that specific language be read to a jury. *United States v. Frazin,* 780 F.2d 1461, 1468 (9th Cir.1986). The court did not abuse its discretion in refusing to give the instructions suggested by Castillo.

### C. Sufficiency of the Evidence

Castillo contends that the evidence was insufficient to demonstrate that he had dominion and control over any of the cocaine, handguns, or currency found in the apartment. He also argues that the Government failed to prove that he had knowledge of the presence of any of these items.

To resolve a challenge to the sufficiency of the evidence, we must review the record

to determine whether there is substantial evidence to support the jury's implied factual findings. Substantial evidence exists if we are satisfied after an independent examination of the record that "a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." *United States v. Douglass*, 780 F.2d 1472, 1476 (9th Cir.1986). It is undisputed that, to sustain a conviction in this matter, the Government was required to prove that Castillo had dominion and control of the cocaine, the handgun, and the currency, and knowledge of their existence. *See United States v. Disla*, 805 F.2d 1340, 1350 (9th Cir.1986) (the Government must prove "a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised a dominion and control over the substance"). The Government may demonstrate dominion and control by proof of actual physical custody or constructive possession. *United States v. Baltimana*, 623 F.2d 1366, 1369 (9th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980). A person has constructive possession of an object if he has sufficient dominion and control to give him the power of disposal. *Id.* Possession and knowledge can be established by circumstantial evidence. *See United States v. Montes–Cardenas*, 746 F.2d 771, 778 (11th Cir.1984) (constructive possession can be established by circumstantial evidence). "Mere proximity to contraband, presence on property where it is found and association with a person or persons having control of it are all insufficient to establish constructive possession." *United States v. Rodriguez*, 761 F.2d 1339, 1341 (9th Cir.1985). However, "[i]f the defendant has exclusive control over the premises where contraband is found, then knowledge and control may be inferred." *Id.*

In support of his challenge to the sufficiency of the evidence, Castillo relies on several cases from this circuit in which we have held that the evidence did not demonstrate knowledge or dominion and control.

In each of these cases, wherein we reversed the conviction, we concluded after reviewing the record that the evidence showed mere presence. A comparison of the dispositive facts in the cases collected in Castillo's briefs, with the contrasting evidence in the instant matter, will demonstrate that the Government's proof was clearly sufficient.

In *Delgado v. United States*, 327 F.2d 641 (9th Cir.1964), marijuana was found in the drawer of a nightstand in a bedroom shared by the two defendants. We held that, because it was pure speculation as to which defendant had possession of the marijuana, neither could be convicted. *Id.* at 642. In *Delgado*, the room where the marijuana was found was used at all times by both defendants. There was no evidence to connect either defendant to the marijuana.

In *United States v. Valenzuela*, 596 F.2d 824 (9th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979), the defendant and her husband lived on the premises where heroin was found in the garage in a bag bearing his name. There was no other evidence connecting her to the heroin. We sustained the conviction of the husband, but concluded that proof of joint occupancy of the home was insufficient evidence that she had dominion and control of the narcotics. *Id.* at 830–31.

In *Arellanes v. United States*, 302 F.2d 603 (9th Cir.), *cert. denied*, 371 U.S. 930, 83 S.Ct. 294, 9 L.Ed.2d 238 (1962), Geneva Arellanes and her husband, Alfredo, were arrested when contraband was found in the car the husband was driving. The contraband was found behind and beneath the rear seat of the car and in a shaving kit that was sitting on top of personal effects on the back seat. We concluded that evidence was sufficient to convict Alfredo Arellanes of possession of the narcotics in the car because he had exercised exclusive dominion and control over the vehicle. We stated that exercise of exclusive dominion and control "is a potent circumstance tending to prove knowledge of the presence of [the] narcotics and control thereof." *Id.* at 607 (quoting *Evans v. United States*, 257 F.2d 121, 128 (9th Cir.), *cert. denied*, 358

U.S. 866, 79 S.Ct. 98, 3 L.Ed.2d 99 (1958)). In reversing the conviction of Geneva Arellanes we stated that her presence as a passenger in a car where narcotics was found was "as fully explained by her attachment to her husband as it might by a control over the drugs." *Id.* at 606.

In *Rodriguez,* Dennis Rodriguez and Jennifer West were convicted of possession of counterfeit bills with the intent to defraud. 761 F.2d at 1340. They were arrested in a motel room in which counterfeit bills were found. *Id.* We affirmed West's conviction because the evidence showed that she attempted to hide counterfeit bills and other evidence of an ongoing counterfeiting operation while the police questioned her about a robbery that had occurred in another part of the motel. *Id.* at 1341. We held that proof of the attempted "coverup" demonstrated dominion and control over the counterfeiting materials. *Id.* We reversed Rodriguez's conviction because the only evidence against him was his presence in the room and his ability to observe the contraband. *Id.*

In *United States v. Behanna,* 814 F.2d 1318 (9th Cir.1987), a machine gun was found in a nylon bag on the floor behind the driver's seat of an automobile in which the defendant, Barbara Behanna, was a passenger. The driver and the passenger were convicted of possession of the machine gun. We affirmed the conviction of the driver but reversed as to the passenger. We held that "the government must do more than show that the defendant was present as a passenger in the vehicle and within reach of the weapon." *Id.* at 1320.

In *Batimana,* 623 F.2d at 1369–70, heroin was delivered to Edgardo Lavadia in a hotel room. The evidence showed that Lavadia had arranged to sell the narcotics to Samuel Nicanor. Minutes after the delivery, and prior to the completion of the sale, all the persons in the hotel room were arrested. The evidence showed that appellants were acting as lookouts at the hotel. On appeal, we concluded that the evidence was sufficient to affirm a conviction for conspiracy to import and possess with intent to distribute heroin. We reasoned that the evidence of possession was insufficient, however, because there was no proof that the appellants had actual or constructive possession of the heroin. *Id.* at 1369. The heroin was in Lavadia's exclusive physical possession during the brief time that elapsed between the delivery of the heroin to the hotel room and the arrest of appellants. We held in *Batimana* that the mere presence of the appellants as lookouts was insufficient to demonstrate dominion and control. *Id.*

In *United States v. Penagos,* 823 F.2d 346 (9th Cir.1987), the defendant was convicted of conspiracy and possession with intent to distribute because the jury accepted the Government's theory that the accused acted as a lookout. *Id.* at 348–51. We reversed because we concluded that the evidence showed that Penagos was a bystander. No evidence was produced from which it could be inferred that the defendant knew that boxes carried by other persons in his presence contained narcotics. *Id.* at 351.

Castillo's reliance on *United States v. Soto,* 716 F.2d 989 (2d Cir.1983), is equally misplaced. Soto was charged with conspiracy. The Second Circuit concluded that evidence of her mere presence in a residence used as "cutting mill" for the dilution of narcotics for street sales was insufficient to prove that she was a member of a conspiracy to distribute narcotics. *Id.* at 991–93. The Second Circuit held that the circumstances surrounding the defendant's presence in the apartment, the fact that she had just come to New York from Puerto Rico with an infant and had no other place to live alternative, were significant to the issue whether her mere presence indicated participation in the conspiracy. *Id.*

The evidence against Castillo, when viewed in the light most favorable to the Government, demonstrated more than his mere presence at the apartment as a casual invitee. Castillo possessed a key to the outer doors of the apartment complex. A rational jury would logically infer from the fact that Castillo was found in a locked bedroom that he was exercising actual and exclusive dominion and control of the room

and its contents. The presence of a gun beneath the mattress directly underneath his body supports an inference that he was prepared to defend his possession of the money and narcotics in the bedroom.

The fact that Castillo's clothing was in the bedroom closet, and his visible agitation concerning the officer's careless handling of the contents of the room during the search, is further demonstration of his possessory interests. In *Williams v. United States*, 418 F.2d 159 (9th Cir.1969), *aff'd*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), we held that evidence that a person arrested in the living room of a residence who thereafter selected clothes from a bedroom closet was sufficient to demonstrate that he had dominion and control over heroin later found on the closet shelf, notwithstanding the absence of any proof that he owned or rented the house. *Id.* at 162–63.

Finally, evidence that cocaine was found in plain view, coupled with the evidence of his physical control of the bedroom, was sufficient to demonstrate knowledge and his dominion and control of all the narcotics found in the bedroom. Our independent review of the evidence has convinced us that any rational jury viewing these facts, and the inferences that can be drawn therefrom, would be persuaded beyond a reasonable doubt that Castillo was knowingly in possession of the cocaine, the handgun, and the money found in the locked second bedroom.

## CONCLUSION

The district court erred in concluding that the affidavit did not establish a substantial basis for the belief that probable cause existed for the arrest of De La Renta. Because we have concluded that the arrest warrant was valid, we affirm the denial of the motion to suppress, without deciding whether the good faith exception to the exclusionary rule applies to defective arrest warrants. Since no error occurred during the trial of this matter, and the evidence of Castillo's guilt was proved beyond a reasonable doubt, the Judgments are AFFIRMED.

NELSON, Circuit Judge, dissenting:

I dissent because I believe that the warrantless search of De La Renta's apartment was not justified by exigent circumstances. A protective sweep without a warrant may be justified by exigent circumstances only if officers reasonably believe that other people might be on the premises who could pose a danger or who could destroy evidence. *See United States v. Whitten*, 706 F.2d 1000, 1014–16 (9th Cir.1983). The officers may not rely on speculation about what circumstances might occur. Rather, they must be able to articulate specific facts demonstrating a threat of violence or destruction of evidence before departing from the normal procedure of obtaining a warrant prior to the search. *See United States v. Alvarez*, 810 F.2d 879, 881 (9th Cir.1987); *see also Arkansas v. Sanders*, 442 U.S. 753, 759–60, 99 S.Ct. 2586, 2590–91, 61 L.Ed.2d 235 (1979). I do not believe that this case presented such exigent circumstances.

The police have not articulated specific reasons for believing that someone might be in the apartment who could harm them. When asked at the suppression hearing why they conducted a protective sweep, the officers involved gave several answers, none of which seems to me sufficient. One officer stated that he believed a second person might be in the apartment because eleven days prior to the arrest an officer had seen another individual entering De La Renta's apartment. The officer testified that he had no information about who this individual was, whether he had an arrest record, or whether he was armed. A second officer testified, when asked if he had any reason to believe anyone was in the apartment, "[w]e didn't know at that time." The same officer then explained that it is simply "standard procedure to do a protective sweep of the premises ... even if we don't know someone is there, we do it in case somebody's there, obviously."

These statements are not sufficient. One cannot reasonably infer from witnessing someone once enter an apartment that the person will be present at any random time. The police had no reason to believe

that Castillo frequented De La Renta's apartment or that he was present on the day of the arrest.

Our cases have upheld protective sweeps only when police had specific reasons to believe that other individuals were present on the premises at the time of the arrest. *See Whitten,* 706 F.2d at 1016 (disallowing a protective sweep because one officer testified that he "did not know whether anyone else was in the room," and because the officers had "no reason to suspect that any accomplice was in the vicinity."). For example, in *United States v. Valles–Valencia,* 811 F.2d 1232, 1236 (9th Cir.), *amended,* 823 F.2d 381 (1987), we found a protective sweep supported because the police, "having seen two men 'running into the brush' ... reasonably ... believ[ed] that two accomplices remained at large somewhere on the premises." Similarly, in *United States v. Alfonso,* 759 F.2d 728, 742 (9th Cir.1985), we permitted a protective sweep of a hotel room because several suspects were at large, the hotel manager told the police that several people were in the hotel room, and the police heard noises coming from the bathroom. *See also United States v. Gilbert,* 774 F.2d 962, 964 (9th Cir.1985) (approving a protective sweep because officers believed that defendant was in the company of an armed fugitive, a car not belonging to the defendant was parked in the driveway, and the officers watching the trailer saw movement inside).

In this case, the officers had seen no one else near the apartment for eleven days, and they had no reason to believe that the person seen eleven days before had any criminal connections. They did not see or hear any movement in the apartment prior to beginning the protective sweep other than sounds made by De La Renta. They did not note any signs of another person's presence, such as a car not belonging to De La Renta. In short, they had no articulable reason to believe that anyone besides De La Renta was in the apartment at the time of the arrest.

The government suggests that several facts not articulated by the officers constitute specific articulable reasons for the protective sweep. It contends that the mention of Malpezzio's bodyguard—Garcia—in Lee's affidavit in support of the arrest warrant reasonably led the officers to believe that Garcia might be waiting in De La Renta's apartment to kill them.

This conclusion is the sort of speculation that I believe is not permitted as support for a warrantless search. *See United States v. Driver,* 776 F.2d 807, 810 (9th Cir.1985) (stating that the government's burden of demonstrating exigency "is not satisfied by leading a court to speculate about what may or might have been the circumstances."). Lee's affidavit indicated to police that Malpezzio, not De La Renta, had hired Garcia as a body guard. It also indicated that the body guard was hired for specific drug transactions, not as the majority suggests "to kill suspected informers, police officers, and anyone who tried to arrest the participants." The police had never seen this body guard in the vicinity of De La Renta's apartment. They had no reason to believe that he would be there. Malpezzi's statement regarding Garcia therefore is not an articulable fact from which the police might reasonably infer that other dangerous individuals would be present.

The government also relies on the police officers' expertise in cocaine cases, and suggests that because cocaine dealers tend to carry weapons and resort to violence, the suspicion of danger was justified. I cannot agree. The exigent-circumstances exception to the search warrant requirement mandates specific facts leading the police to fear for their safety. If the general fear that cocaine dealers are violent could fulfill this requirement, we would essentially create a cocaine exception to the search-warrant requirement. Our cases have not yet supported such a broad exception. *See, e.g., United States v. Hatcher,* 680 F.2d 438, 444 (6th Cir.1982) (finding in a heroin case that the protective sweep was not justified merely because the subject of drugs was involved and warning that this reasoning would "permit wholesale abrogation of the Fourth Amendment reasonableness requirement.").

This court has previously recognized the danger of permitting a blanket exception to the fourth amendment without requiring specific circumstances justifying a finding of exigency. Such an exception endangers the constitutional framework. We stated in *United States v. Flikenger*, 573 F.2d 1349, 1355 (9th Cir.1978),

[W]e are not unsympathetic with the government's premise that "any time agents seek to effect an arrest or search of a residence, with or without a warrant, the possibility that persons inside might have access to weapons is very real and sometimes critical." Followed to its logical conclusion, however, the government's contention would obviate the necessity for a warrant in any arrest in a residence, because every such arrest would involve the potential use of weapons.

Following the insight offered by the *Flickenger* panel, I believe that we should not permit the government to obviate the need for a search warrant in every cocaine-related arrest. Although we must remain sympathetic to the dangers of cocaine investigations, and although the presence of cocaine might increase officers reasonable fears if they have other reasons to believe individuals are present in a residence, a blanket exception to the exigency requirement in all cocaine cases would abrogate the fourth amendment rights of all cocaine suspects.

In this case, I believe that the only articulable reason for conducting the protective sweep was stated clearly by one of the officers: it is "standard procedure to do a protective sweep ... even if we don't know someone is there, we do it." That protective sweeps have become standard procedures suggests that abrogating criminal defendant's fourth amendment rights has also become standard procedure. The Supreme Court has repeatedly held that warrantless searches are presumptively unreasonable, *see, e.g., Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed. 2d 639 (1980), and that exigent circumstance exceptions must be "jealously and carefully drawn." *See Coolidge v. New Hampshire*, 403 U.S. 443, 445, 91 S.Ct.

2022, 2027, 29 L.Ed.2d 564 (1971). If we are to maintain the constitutional presumption by drawing exceptions jealously, then police must articulate a more concrete reason for protective searches than that it is standard procedure in cocaine arrests.

The protective sweep in this case was especially unjustified because De La Renta was arrested in his doorway, where he was quickly handcuffed. The officers have stated no reason for not removing De La Renta from the premises immediately without ever entering his apartment. *Cf. Vale v. Louisiana*, 399 U.S. 30, 33–34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970); *Whitten*, 706 F.2d at 1016 (stating that "if a search is to be upheld as incident to an arrest, the arrest must take place inside the house."). An arrest accomplished outside the premises permits a protective sweep only in the rare circumstance that the arresting officers have a specific reason to believe that their safe retreat is not possible. *Compare United States v. Astorga–Torres*, 682 F.2d 1331 (9th Cir.1982) (finding protective sweep justified because officers had been fired upon from several locations in the house before arresting the defendant as he emerged) *with United States v. Spetz*, 721 F.2d 1457 (9th Cir.1983) (finding protective sweep unjustified because suspects were unarmed when they were arrested outside the house). Even if the circumstances in this case raise articulable fears that would justify a protective sweep to protect officers inside the apartment, because the officers needn't have entered the apartment at all, the protective search was not justified. *See Driver*, 776 F.2d at 810 (stating that agents would not have feared for their safety if they had not first impermissibly entered the building).

Because I believe that the protective sweep violated the constitutional warrant requirement, I would reverse the convictions, and would exclude evidence seized during the sweep from any retrial. I would also exclude any evidence seized later during the search based on consent, because in this case, De La Renta's consent to search came as the direct result of exploiting the results of the protective sweep.

*See Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975). Even assuming that the consent was voluntary, the permission came within minutes of the illegal search, and no intervening circumstances served to attenuate the taint. *See id.* at 603–04, 95 S.Ct. at 2261–62; *United States v. Perez–Esparza,* 609 F.2d 1284, 1289 (9th Cir.1979). Because the government has not demonstrated attenuation, *see United States v. Taheri,* 648 F.2d 598, 601 (9th Cir.1981), I would exclude evidence seized after the consent.